STATE of Minnesota, Petitioner,
Appellant,

v.

King Buachee LEE, Respondent.

No. C9–91–560.

Supreme Court of Minnesota.

Dec. 31, 1992.

Rehearing Dismissed Feb. 12, 1993.

Hubert H. Humphrey, III, Atty. Gen., Clayton M. Robinson, Steven C. DeCoster, Asst. Ramsey County Atty., St. Paul, for appellant.

Philip G. Villaume, Bloomington, Peter N. Thompson, St. Paul, for respondent.

KEITH, Chief Justice.

We granted the state's petition for review of a decision of the court of appeals granting a new trial to defendant, King Buachee Lee, a leader in the Hmong–American immigrant community in St. Paul convicted of three counts of criminal sexual conduct in the third degree for three separate acts of rape of two different Hmong–American immigrant women. The court of appeals ruled the trial court prejudicially erred (a) in upholding the invocation of the marital privilege to exclude certain evidence the defense claims would have been favorable to defendant, and (b) in allowing the state on rebuttal to present evidence of a similar rape by a different Hmong immigrant for the purpose of countering expert testimony by the president of defendant's "clan" as to "Hmong ways" which gave the jury the impression that he did not believe complainants were telling the truth. *State v. Lee*, 480 N.W.2d 668 (Minn.App. 1992). After addressing these and other issues raised by defendant, we conclude that defendant received a fair trial and was properly convicted of and sentenced for the crimes in question. Accordingly, we reverse the decision of the court of appeals and reinstate the convictions.

Defendant was one of the early Hmong immigrants, coming to the United States in 1976. He is both educated and acculturated. At the time of the events in question he had three jobs, working as a Hmong technical tutor at St. Paul Technical Vocational Institute (TVI), coordinating a program called the Language Project (which provides instruction in English as a second language and assistance to those seeking a high school equivalency degree), and selling real estate. Complainants, "A" and "B," are uneducated and relatively unacculturated. One of them, A, came to the United States in 1981, was 34 years old at the time of trial, is married, and is the mother of seven children. The other, B, is younger, only 22 at the time of trial, and had been in the United States only two years; she is married and is the mother of two children.

In the fall of 1989 the two women, who had not previously known each other enrolled in an electronics assembly class at TVI designed to train them and others, mostly Hmong men and women, for jobs in electronics assembly.

In March of 1990, after the two women had completed the course, Blong Vang, an "Educational Assistant" at TVI, told defendant, who also worked there, that he should call the students and take them to a plant in New Brighton and help them fill out job applications. The group went in a caravan, with defendant, accompanied by A and B, leading the way in his pickup truck. After the interview, defendant had to go to the language class he taught in Minneapolis; therefore, he drove with the women to Minneapolis, then gave the keys to A and told her to drive back with B to TVI and leave the keys with Blong Vang.

According to A, defendant called her at home a couple days later and told her to meet him in the TVI parking lot the following morning because he was going to take her to apply for another job. After A met him and got into his car, defendant drove to Premier Bank in Maplewood and cashed a check. He then drove her to the Emerald Inn, a four-story motel. Because she was unfamiliar with many things in America, she did not know it was a motel or what a motel was. It was not until defendant took her into a room and she saw a bed that she became suspicious that she was not going to a job interview. She testified that defendant then attacked her and raped her, threatening to kill her if she screamed or scratched him. Afterwards, he threatened to kill her family if she told anyone. She testified that she did not tell her husband or anyone else because she believed defendant's threats.

She testified that the following day defendant called her and told her to meet him in the TVI lot that evening after her language class or he would follow through on his threats against her family. She testified that she got through at 10:00 p.m. and that defendant, telling her he was going to give her his child, entered her car and proceeded to rape her again. She testified

that defendant bruised her on the leg in the process.

This second rape allegedly occurred on a Wednesday night. The following Monday morning B, who does not drive, arrived early for her language class, a class A also was taking. A was sitting in her car in the parking lot and invited B to sit with her and wait for the class to start. While they were waiting, defendant, who apparently knew their schedules, drove up and said he wanted to take them to look for jobs. Because of what had happened, A did not want to ride with defendant so she said that they would follow him. Defendant then drove to a park and stopped. Defendant said that they would have to get in his car to fill out the application papers. When defendant turned on the car stereo and just talked about the weather, A fled, leaving her purse behind, and drove off in her car. B testified that defendant then drove her to what he said was his house (in fact it was) and into the garage. She testified that when she refused to go into the house, defendant attacked her in the car, hitting her on the thighs and shoulders and raping her. Afterwards he said if she told her husband or anyone else he would kill her family. B testified that as she grabbed A's purse and left, defendant's wife drove up.

B walked to a neighbor's house and asked Peter Heywood, who was working on his car, for help in finding a bus. Heywood testified that B was obviously extremely upset but that he did not notice her limping, as she claimed she was in her testimony. Defendant and his wife then drove up and talked with her in Hmong. Heywood testified that she did not seem to want to have anything to do with them. B testified that defendant's wife offered to give her a ride but that she said no. Heywood and his wife then gave B a ride to the bus stop.

Both women testified that they felt ashamed, soiled, and depressed and did not know what to do. It is not clear from the record exactly what events led to the commencement of the prosecution, but B was the first to tell police in early May she had been raped. Police apparently questioned

A, and she eventually told them that defendant also had raped her. It appears that before the police learned of any of this the women had told their families and that the elders, following the traditional Hmong way, had tried to have the matter arbitrated, with defendant paying compensation. Defendant refused to pay compensation, and the matter thereafter came to police attention.

The testimony of A corroborated the testimony of B, and the testimony of B corroborated parts of the testimony of A. Additionally, the state was able to produce a number of other items of corroboration: (a) A's ripped pants were placed in evidence; (b) a doctor who examined B on May 2 testified that he found a large old bruise on B's left hip that was consistent with her testimony about being thrown violently onto her hip on March 26 (but that it was also possible the bruise was inflicted later); (c) driving around with a police officer, A and B were able to use certain landmarks to help the police locate the bank, the motel and the home; (d) A was able to describe the interior of the motel room before the police entered it; (e) the state was able to establish that defendant cashed a check at the bank at 10:42 a.m. the day that A said they stopped at the bank on the way to the motel; (f) the state was able to establish that defendant registered in the motel using the name of a relative living in Des Moines; and (g) Heywood provided corroborating testimony about B's demeanor when she asked for help.

Defendant claimed that he had once courted A back in Laos but had forgotten it and that A brought it up when he was driving the two of them to the job interview. (A denied this, and both A and B denied that any conversation whatever occurred during the trip.) Defendant testified that she began calling him at home and at his place of employment. He testified that A told him that she had loved him all the years of separation and insisted on meeting him in the TVI lot the following day. He testified that it was she who suggested they sleep together, saying, "I'd like to have you once, and that would be enough in my life." Later defendant testi-

fied that she verbally forced him to do it. He testified that he said he would do it if that would satisfy her and if she insisted. He testified that she suggested going to his house but that he would not do that because his wife would be there. He denied beating her or threatening her, saying that in his culture "we don't do that." He claimed he saw a bruise on her leg and that she said it was a result of her husband beating her.

Defendant testified that the second act of intercourse was again at A's insistence, that she begged him to do it, saying she wanted his baby. He testified he agreed by saying he would do it but he wanted to get it over with quickly because he had an appointment.

Regarding the incident with B, defendant testified that B asked him to show her his house and that he took her there because his wife had left him that very day. He testified that he wanted to go into the house but that B insisted on staying in the car.

He testified that later the women began harassing him, saying that they wanted him to marry them, taking them as his second and third wives; that they asked for money; that B gave him a cassette recording of her singing Hmong love songs (the tape was played to the jury, but B denied it was her voice and denied giving him the tape). In short, defendant testified that the women were furious at being scorned and were lying when they claimed rape. He testified that B told him that her husband was the one who had beaten her badly, which explained the bruises.

■ 1. The first issue we address is the issue relating to the trial court's exclusion of evidence based on the marital privilege. Defendant contends that the effect of the exclusion of this evidence was to deny him his right of compulsory process guaranteed by the Sixth Amendment.

One of the witnesses called by the defense was St. Paul Police Officer Gnia Kong, a Hmong–American. It appears that Officer Kong would have testified that he responded to a report of a domestic

dispute on May 16, 1990, at the house of A and her husband, and that the husband, with tears in his eyes, told him he did not want A in his house any more because he had "just found out" that she "committed adultery." The trial court excluded the evidence, ruling it inadmissible under the marital privilege. Similarly, again relying on the marital privilege, the trial court refused to allow defendant to call the husbands and refused to allow defendant to present a tape-recorded conversation defendant had with B's husband in which the husband admitted beating B and asked defendant why he and B were having an affair.

The state concedes that the trial court's reliance on the marital privilege was error under *State v. Leecy*, 294 N.W.2d 280 (Minn.1980), but argues that the record on appeal does not justify the conclusion either (a) that the testimony of the husbands was otherwise admissible under the rules relating to foundation and relevance or (b) that any error in the exclusion of the evidence was prejudicial.

The evidence in question apparently was offered in the hope that it would establish (a) that the complainants admitted having affairs with defendant; (b) that the husbands believed their wives had affairs with defendant; or (c) that the husbands hit or beat the wives and caused any bruises observed on them.

What the husbands believed was irrelevant and clearly inadmissible under Minn. R.Evid. 401 and 403, particularly given the high likelihood such evidence would cause *unfair* prejudice to the state's case. Similarly, that the husbands may have said to other people they believed their wives had been having affairs was clearly inadmissible.

■ However, evidence that the wives admitted to their husbands, with third parties present, they had had affairs with defendant would have been admissible without violating the marital privilege *if* there

was such evidence. Similarly, evidence the husbands hit or beat the wives *and* caused the bruises attributable to defendant would have been admissible *if* there was such evidence. The court of appeals' opinion assumes there was such evidence.[1] An appellate court, however, can only base a determination that error occurred on the record. The record on appeal fails to establish that the defense had such evidence. Stated differently, defendant did not properly preserve the claimed errors for review by making an offer of proof showing the nature of the evidence excluded so that courts on appeal could determine if it was error to exclude the evidence and whether the error, if any, was prejudicial. The fact the trial court believed the marital privilege was applicable did not preclude the defense from making an adequate record. Defendant could have asked the trial court to make an *in camera* record of an examination by the court of the husbands. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 61, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987), and Robert Weisberg, Note, *Defendant v. Witness: Measuring Confrontation and Compulsory Process Rights Against Statutory Communications Privileges*, 30 Stan.L.Rev. 935, 976–78 (1978). Defendant did not do so.

In summary, the record that we have simply does not support defendant's contention that the trial court committed prejudicial error in excluding defense evidence, and we cannot rely on defendant's speculation as to what the record might have shown if he had made an adequate offer of proof.

■ 2. The other issue on which the court of appeals based the award of a new trial relates to the trial court's allowing the state on rebuttal to present evidence of a similar rape by a different Hmong immigrant for the purpose of countering expert testimony by the president of defendant's "clan" casting doubt on the credibility of the complainants.

---

1. It is, in fact, quite possible that there was no such evidence; post-trial affidavits of the husbands indicate that their testimony would not have helped establish defendant's claim that the

complainants admitted having consensual intercourse with defendant or that the husbands caused any bruises attributable to defendant.

It is evident from the record that defendant's witness, Nhia Vang Lee, tried to acquaint the jury with Hmong ways in a manner that would help convince the jury the women were lying. He testified that Hmong men can only date or court unmarried women; that a married Hmong woman cannot see other men; that a Hmong man would not commit adultery with a Hmong woman unless she encouraged him; that if they were caught, the Hmong community would take care of the matter through arbitration; that rape is very rare in Hmong culture; that if it occurred the woman would not be believed unless she were bleeding, battered, wearing torn clothes, etc., and unless she had witnesses; that if a rape occurred without a woman's encouragement, the Hmong community would make the perpetrator pay and the woman would suffer no losses. On cross-examination he articulated his point even more clearly, stating that "we don't totally believe" it if a woman claims she refuses and yet was raped, that adultery is presumed unless the woman has taken her body to a Hmong judge or elder immediately after the incident for evidence's sake, that a rape victim would tell at all costs if raped and would not wait a couple of days, and that in his experience there were no cases where a rape victim waited as long as two or three days to complain.

On rebuttal the state called the two complainants, who denied the testimony of defendant that they had begged him to have sex with them, and also called two experts, one a professor from the University of Washington (whose testimony we are not concerned with directly but whose testimony helped the jury understand the testimony of the two women in the context of Hmong culture and helped establish that Hmong women do not necessarily report rape immediately, as defendant's expert said) and the other Jean Schleh, an Assistant Ramsey County Attorney. Ms. Schleh testified without objection that there were similarities between the facts in this case and the facts in another prosecution based on the rape of a Hmong married woman by a different Hmong man that occurred on March 14, 1990. When the prosecutor asked what the similarities were, defense counsel objected. It was then the trial court ruled the defense had "opened the door" by its expert testimony. Witness Schleh proceeded to testify as to the similarities between the two cases, including the fact that the complainant in the other case waited 48 hours before reporting the rape, doing so only after talking with her husband, who consulted his male elders. Defense counsel elicited testimony on cross-examination that there had been a handful of other Hmong rape cases that did not go to trial.

The court of appeals' opinion presents the issue of the admission of this evidence in a vacuum, leaving out the fact that the trial court based admission on the theory that defense counsel "opened the door" by eliciting the expert testimony suggesting that the two complainants were lying. *See* *State v. Lee*, 480 N.W.2d 668, 672–73 (Minn.App.1992).

In *State v. Myers*, 359 N.W.2d 604, 611 (Minn.1984), a criminal sexual conduct prosecution, the defense sought to discredit the complainant by showing that the complainant's mother, the "ultimate 'expert' with respect to the complainant," did not believe her for several months. The trial court ruled that that evidence "opened the door" to the admission of opinion testimony by another expert that complainant's allegations were truthful. We said that as a general rule we would reject such expert testimony but that defendant could not complain about the admission of the evidence, which was merely responsive to defendant's "expert" testimony regarding complainant's truthfulness. *Id.* at 611–12.

In the instant case the clear purpose of the testimony of defendant's expert was to convey the impression that in the Hmong community the complaints by A and B were not considered credible because Hmong women who have been raped do not act, post-rape, as these complainants did. We agree with the defense that the testimony of Ms. Schleh was highly unusual, but we also believe that under the unique circumstances of this case the trial court did not abuse its discretion in allowing the testimo-

ny on rebuttal for the purpose of counteracting the arguably misleading testimony of defendant's witness.

■ Defendant, of course, could have obtained a cautionary instruction limiting the jury's consideration of this evidence. However, as we have held in the context of other-crime evidence admitted under Minn. R.Evid. 404(b), it is not plain error for the trial court to fail to give such a cautionary instruction. *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn.1992) (holding that it was not reversible error for trial court to fail to give cautionary instruction concerning use of other-crime evidence).

■ In any event, we are satisfied that even if the trial court erred in admitting the evidence or in not giving a cautionary instruction, any error was not prejudicial because (a) it is unlikely the jury used the evidence for an improper purpose; (b) there were two victims, each corroborating the other in significant ways; (c) there was independent corroboration of much of the complainants' testimony; (d) the testimony of defendant stretched credulity and arguably helped the state more than it helped defendant; and (e) the jury obviously was not an impassioned jury, since it acquitted defendant of three more serious charges of criminal sexual conduct in the first degree.[2]

3. Other issues raised by defendant do not merit detailed discussion.

(a) Defendant claims he was prejudiced by inaccurate translations at the trial. It appears from the record, however, that the trial court was cognizant of the risks of inaccurate translations and took reasonable steps to insure that the translations were fair and accurate. In *State v. Mitjans*, 408 N.W.2d 824, 832 (Minn.1987), we said:

Translation is an art more than a science, and there is no such thing as a perfect translation * * *. Indeed, in every case there will be room for disagreement among expert translators over some aspects of the translation. Defense counsel, with the assistance of the defendant's own interpreter, is always free to object contemporaneously if counsel believes that the court-appointed interpreter has significantly misinterpreted or omitted parts of * * * testimony.

Defendant apparently has worked in the capacity of a translator himself. He therefore had every opportunity to bring any problems to the trial court's attention and to make specific offers of proof as problems arose. The trial court appeared to recognize the potential translation difficulties and adequately addressed the problems when they developed. Defendant has failed to establish any prejudice to himself by the interpreters used at trial.

(b) Defendant has not met his burden of establishing ineffective assistance by trial counsel. He has failed to demonstrate that trial counsel's choices were anything other than trial strategy. In order to prevail on an ineffective assistance claim, defendant has to establish not only that counsel's performance was deficient but that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987). Defendant has done neither.

■ (c) Finally, defendant claims the sentence imposed by the trial court was improper. Using the *Hernandez* method of computing the defendant's criminal history score, the trial court, without having to point to any aggravating circumstances,

---

**2.** It also is worth noting, from reading the 12–volume trial transcript, that defendant and his supporters did their best to prevent the case from ever coming to trial and did their best to make things difficult for complainants during the trial (defendant's wife had to be cautioned for harassing a witness; defendant had to be cautioned for his hostile body language during the testimony of one of the complainants; and a courtroom supporter of defendant called one of the complainants a "fuck face" in the Hmong language when the witness was leaving the

stand and walking out of the courtroom). The jury was exposed to some of this behavior (*e.g.,* defendant's inappropriate body language when one of the complainants testified). While not necessarily relevant to the issues raised on appeal, this is arguably relevant in part to the issue of whether there is a reasonable possibility that any error by the trial court in its evidentiary rulings had an impact on the verdicts. We, however, base our conclusion that any error was harmless on the factors recited in the main text of this opinion.

could have imposed concurrent sentences of 48 (44–52) months for count I (rape of A), a concurrent sentence of 58 (54–62) months for count II (second rape of A) and, (using a zero criminal history score for any offense sentenced consecutively) a consecutive term of 48 (44–52) months for count III (rape of B)—in other words, a maximum aggregate term of 114 (62 + 52) months. The trial court doubled the median presumptive sentence for each of the offenses, obtaining concurrent sentences of 96 months for count I and 116 months for count II, and a consecutive term of 96 months for count III—*i.e.,* an aggregate term of 212 months (116 + 96).

■ The use of consecutive sentencing was, as we said, proper even without the presence of aggravating circumstances. Under Minnesota Sentencing Guidelines II. F.2. the trial court may use consecutive sentencing "(2) [w]hen the offender is convicted of multiple current felony convictions for crimes against different persons, and when the sentence for the most severe current conviction is executed according to the guidelines." The only real question is whether aggravating circumstances were present justifying the doubling of the presumptive sentences. The trial court found aggravating circumstances present in defendant's abuse of his position of trust and authority. In this the case is not unlike *State v. Carpenter,* 459 N.W.2d 121 (Minn. 1990), where we upheld an upward durational departure on the ground the defendant, an adult working in a youth program at a church, abused his position of trust and authority in persuading a teenager not of the age of consent to have sexual intercourse with him. Here the defendant clearly abused his position of authority at TVI and his position as a leader in the Hmong community to maneuver the complainants into situations where he could sexually assault them. Moreover, it appears that defendant's conduct has had a clearly foreseeable *devastating impact* on the lives of both complainants. We conclude that aggravating circumstances were present and that the trial court did not abuse its discretion in departing on the

basis of those circumstances. *State v. Best,* 449 N.W.2d 426, 427 (Minn.1989).

In summary, we are satisfied: (a) that defendant received a fair trial; (b) that the jury was justified in crediting, as it obviously did, the testimony of the two complainants that they were raped and in rejecting the testimony of defendant that they consented; and (c) that the trial court did not err in sentencing defendant as it did.

Reversed and convictions reinstated.

TOMLJANOVICH, Justice (dissenting).

I respectfully dissent. Unlike the majority, I believe that the trial court's erroneous application of the marital privilege and inclusion of the testimony by Jean Schleh constitute reversible error. Thus I would affirm the court of appeals.

Lee alleged that the complainants fabricated their claims that he had raped them. To demonstrate this, he wanted to call the complainants' husbands; he asserted that the husbands would testify that the wives did not initially claim that they had been raped but had originally said they were having affairs with him. Both husbands have reportedly made statements that they believed their wives were indeed having affairs with Lee. The defense should have been able to question the husbands on this point, specifically as to what the husbands saw or were told by their wives. What the husbands knew regarding their wives relationships with Lee was critical to the defense. Yet the defense was not allowed to question these men at all because of the trial court's erroneous interpretation of the marital privilege.

Lee also asserted that he did not inflict the bruises on the complainants, but rather that they were caused by the complainants' husbands. At the very least, he should have been allowed to put the husbands on the stand ·and ask them if they beat their wives and had caused the bruises.

The majority avoids these issues and instead rests its decision on the defendant's alleged failure to make offers of proof as to them. I believe that a review of the trial transcript makes it clear why the defense

wanted to call the husbands. Although it is preferable to make a formal offer of proof, defense counsel made it clear that he wanted to use the husband's testimony to impeach the complainants and to build the defenses of consent and fabrication.

I also believe it was inappropriate to admit Schleh's testimony regarding a similar but unrelated criminal prosecution. In *State v. Blasus*, 445 N.W.2d 535 (Minn. 1989), this court held that questioning an *expert witness* about participation in notorious cases required reversal in a close case because of the danger that the jury might have been prejudiced by the facts of the other cases. I do not find this case distinguishable from *Blasus*. In this case, as in that case, I believe "the prosecution intended the jury to mentally link [the accused] with [the facts] of other cases." *Id.* at 540. Schleh's testimony clearly could have prejudiced the jury. As the court of appeals noted:

> The prejudice resulting from this testimony is even greater than the prejudice found in *Blasus* because the notorious prosecution taints the defendant himself, not just a defense witness.

*Lee,* 480 N.W.2d at 673. I agree.

The majority says the admission of the testimony is acceptable because the defendant "opened the door" by claiming that the complainants were lying. Although part of the defense was that the women were not telling the truth, I do not believe this should open the door to highly prejudicial expert testimony regarding other rapes in the Hmong community, especially when this testimony was made by an Assistant Ramsey County Attorney who worked on the charging phase of this case. A defendant does not consent to the admission of prejudicial testimony by mounting a defense.

Once a defendant establishes a constitutional violation, the burden of proof shifts to the state to prove that the violation is harmless beyond a reasonable doubt. *State v. Conklin,* 444 N.W.2d 268, 275 (Minn.1989) (citing *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)). My review of the record indicates that this was a close case; some evidence and some witnesses went each way. The state has not demonstrated on appeal that the jury would have reached the same result if the husbands had been required to testify and Schleh had not been allowed to testify in the fashion she did. Therefore, I must dissent.

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice Tomljanovich.