STATE of Minnesota, Respondent,

v.

Chia James VUE, Appellant.

No. C3-99-863.

Court of Appeals of Minnesota.

Feb. 29, 2000.

Mike Hatch, Attorney General, St. Paul, and James C. Backstrom, Dakota County Attorney, Debra E. Schmidt, Assistant Dakota Country Attorney, Hastings, for respondent.

Kyle D. White, St. Paul, for appellant.

Considered and decided by PETERSON, Presiding Judge, RANDALL, Judge, and KLAPHAKE, Judge.

## OPINION

RANDALL, Judge

A Dakota County jury found appellant Chia James Vue guilty of one count of first-degree criminal sexual conduct, three counts of third-degree criminal sexual conduct, four counts of violating an order for protection, and one count of engaging in a pattern of harassing conduct. Appellant challenges his convictions and sentence, claiming (1) the district court erred in admitting expert testimony on Hmong cultural practices, (2) prosecutorial misconduct, (3) insufficient evidence, (4) double jeopardy for multiple prosecutions and punishments for offenses arising out of the same conduct, and (5) the district court erred in refusing to make a downward dispositional departure. We reverse on the basis of improper expert testimony.

## FACTS

Appellant and M.V. are Hmong immigrants who came to the United States from Laos in the late 1970s. They were never legally married, but lived as husband and wife from 1980 through the mid-to-late 1990s, when their relationship deteriorated. In February 1998, M.V. obtained an order for protection against appellant.

On June 5, 1998, M.V. reported appellant to the police, claiming he had raped her four times in four separate incidents occurring between February and May 1998. Appellant was arrested and charged with four counts of criminal sexual conduct, four counts of violating an order for protection, and one count of pattern of harassing conduct.

Before jury selection, the court and counsel had a preliminary discussion on the state's plan to introduce expert testimony on Hmong culture. The prosecutor noted that the jury pool's responses to questionnaires showed a poor understanding of Hmong culture. The prosecutor sought to introduce expert testimony to provide context for the jury's determinations of witness credibility, but said the expert would not comment on the case itself. The prosecutor described the scope of the proposed testimony and added that it could help explain M.V.'s delay in coming forward and rebut the defense theory that the allegations were rooted in M.V.'s jealousy of appellant's second wife. The defense objected to the proposed testimony, and the court took the matter under advisement.

At trial, M.V. testified about the clan structure of Hmong society, the hierarchy of leadership within the clan, and the role of Hmong women in choosing a husband. She said it was inappropriate in Hmong culture for individuals with family or clan-related problems to seek help from outside the clan and that she was being treated as an outcast for having reported her hus-

band to the police. She claimed appellant had been threatening and abusive to her throughout their marriage and had forced her to have sex with him hundreds of times. She said she did not report the rapes earlier because of Hmong social pressure and because appellant said he would kill her if she did.

During a break in the state's case-in-chief, the court held a voir dire examination of the proposed expert witness, a white Minneapolis Park Police officer, and a hearing on the defense motion to exclude his testimony. On direct and cross-examination, the officer described his interest in and personal and professional exposure to Hmong culture.

The prosecutor said the officer would testify to the following: a general history of the Hmong in America; the clan system and the hierarchy within the clans; assimilation issues facing the Hmong in America; Hmong–Americans' attitudes toward the American criminal justice system; the traditional system for resolving family and clan-related problems; issues with going outside the clan for help; the role and position of women in Hmong culture; and male-female relations in traditional marriages.

In allowing the testimony, the court compared it to expert testimony on battered woman syndrome, noted it was being offered to promote a complete understanding of the evidence, and found it would be helpful to the jury.

As an example of a conflict between Hmong culture and the American legal system, the officer described a traditional marriage practice in which men "kidnap" young girls. Among other generalized statements, the state's expert testified that Southeast Asian victims are generally reluctant to report crimes. Speaking of Hmong culture, he testified in part:

Well, as I indicated it is a male-dominated culture, very clearly. It's not the only culture that's male dominated, I might add, but it's very clear in Hmong culture. Women are to be obedient, to be silent, to suffer rather than to tell. Domestic abuse is a very private situation. I'm not even so sure if the abuse is shared with other women. I think it's kept very much internal.

On cross-examination, the officer stated that "male-dominance" was "fairly universal in the Hmong culture." In addition, the defense counsel asked and the expert responded as follows:

Q: Are you suggesting that what male dominance really means is abuse?

A: I have seen evidence—secondhand, I might add, maybe third-hand, not firsthand or I would have to act as a police officer—of male aggression within the Hmong community to keep the female in her place.

Q: Are you saying that that is a general trait or are you saying that all Hmong traditional males are abusive?

A: I've been around long enough to know that you can never make a statement that says all of anything will happen all of the time. I think there are patterns that can be identified over time and that that pattern is disturbing in the Hmong culture.

## ISSUE

Did the district court abuse its discretion in admitting expert testimony on aspects of Hmong culture?

## ANALYSIS

■ Appellant argues the expert testimony was inadmissible cultural stereotyping calculated to appeal to cultural and racial prejudice. He claims it (1) lacked foundation, (2) was irrelevant and unduly prejudicial, and (3) violated public policy and his state and federal constitutional rights to a fair trial, the presumption of innocence, due process, and equal protection. We agree.

■ Generally, admission of expert testimony rests within the district court's discretion and will not be reversed absent

clear error. *State v. Koskela*, 536 N.W.2d 625, 629 (Minn.1995). Even where a defendant alleges a constitutional violation, we review evidentiary questions for abuse of discretion. *State v. Profit*, 591 N.W.2d 451, 463 (Minn.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 153, 145 L.Ed.2d 130 (1999).

Minn. R. Evid. 702 sets the basic standard for admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

■ But, along with the bare bones provisions of Minn. R. Evid. 702, a district court may consider the offered expert testimony under a balancing test embodied in Minn. R. Evid. 403:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

*See State v. Nystrom*, 596 N.W.2d 256, 259 (Minn.1999) (holding district court must scrutinize proffered expert testimony and exclude it if it is irrelevant, confusing, or not helpful).

■ In criminal trials in particular, courts must be cautious when ruling on the admissibility of expert testimony. *Id.* at 259–60. This is necessary to guard against the expert's "potential to influence a jury unduly" with his court-recognized "special knowledge" and to "ensure that the defendant's presumption of innocence does not get lost in the flurry of expert testimony." *State v. Grecinger*, 569 N.W.2d 189, 193 (Minn.1997).

In this case, the primary issue at trial was whether M.V. consented to the sexual contact with appellant. Both sides addressed her delay in bringing the allegations. The prosecutor offered the testimony of a park policeman to bolster M.V.'s story by "explaining" why a Hmong immigrant who had been raped by her husband would be reluctant to go to the police.

There is little in this record suggesting cultural testimony was necessary. The complainant was a grown woman; she was bilingual and educated; and she had been in the United States for many years. A lay jury would not have had trouble understanding or believing her testimony simply because she was Hmong. It is patronizing to suggest otherwise. *See State v. Myers*, 359 N.W.2d 604, 610 (Minn.1984) (stating in most sexual-assault cases, risk of undue influence on jury mitigates against admitting expert testimony concerning an *adult complainant's* credibility, but recognizing limited exceptions for unusual cases as where alleged victim is child or mentally retarded person). The expert testimony itself confirmed the lack of relevancy to this case and to this victim. The transcription shows the following questions and answers:

Q: Are you saying then—and this is what I'm leading up to, Lieutenant—that all of the Hmong people in Minnesota are following the same cultural trends?

A: I would not say that all Hmong follow the same cultural trends, but I would say that the Hmong culture that I've observed is slower to change than other cultures that I've observed.

Q: Would you say that language is one reason why, at least in your observations, there has been a slower cultural change?

A: I would strongly agree that, *particularly among older Hmong citizens where English is nonexistent or very difficult at best.* I would say that the isolation that comes from not being able to go to a mall and shop and exchange normal conversation with shopkeepers

or other people in society has kept Hmong women, in particular older Hmong women, prisoners in their homes.

(Emphasis added.) Thus, the "expert's" cultural testimony emphasized the barriers on reporting "among older Hmong citizens where English is nonexistent or very difficult at best." This is not our case.

Further, the credentials of this Minneapolis Park Police officer to give expert opinions on Hmong culture are suspect. The record shows that the officer's contact with Hmong culture arose primarily from personal experience with family friends, that his exposure to Hmong culture as a police officer was limited, and that he had little or no academic training involving Hmong culture.

While we acknowledge there is no formal requirement to qualifying as an expert under Minn. R. Evid. 702, the informal nature of this officer's familiarity with Hmong culture brings his qualifications to be an expert into doubt. *See Vang v. Toyed*, 944 F.2d 476, 480–81 (9th Cir.1991) (holding district court properly allowed *epidemiologist* to testify as expert on Hmong culture in *civil action* related to rapes of Hmong victims); *State v. Lee*, 494 N.W.2d 475, 480 (Minn.1992) (stating in dictum that university professor's testimony on Hmong culture was helpful to jury in rape trial involving Hmong victims).

We note that here, unlike *Lee*, the defense did not open the door to the testimony by attacking the complainant's credibility with its own expert. *See Lee*, 494 N.W.2d at 480–81 (finding no reversible error in allowing state's expert to testify about unrelated rape of Hmong woman to rebut testimony by defense expert, a Hmong elder, attacking victims' credibility).

The "expert" testimony was inherently prejudicial. It went far beyond describing Hmong cultural practices that would help explain the alleged victim's behavior, *if* such testimony was needed. The testimony included generic statements about "male-dominance" in Hmong culture and directly implied a generalized perceived pattern of abuse of Hmong females by Hmong males.

While some of these statements could conceivably be relevant to a complainant's reluctance to come forward, their probative value, if any, is based on generalizations that appellant is part of a "guilty class" of spouse-abusers, and the victim is part of a "victim class" of abused women. By asserting that Hmong men tend to abuse their wives, the expert testimony directly implied to the jury that because defendant was Hmong, he was more likely to have assaulted his wife. It is self-evident that this is highly prejudicial. It is impermissible to link a defendant's ethnicity to the likelihood of his guilt. *See, e.g., United States v. Vue*, 13 F.3d 1206, 1212–14 (8th Cir.1994) (reversing opium-related convictions of Hmong defendants for error in allowing expert to testify that 95% of the opium-smuggling cases in the area were Hmong-related); *see also United States v. Doe*, 903 F.2d 16, 20–22 (D.C.Cir.1990) (holding expert testimony concerning Jamaican immigrants' takeover of local drug trade was unfairly prejudicial in drug trial of Jamaican defendants).

Our criminal code is supposed to be blind to the array of cultures present in the State of Minnesota. The state wants it that way when cultural testimony goes against them. The state conceded at oral argument that it would object, in a statutory rape case or a domestic abuse trial, if defense counsel attempted to introduce expert evidence showing the charged conduct was permissible in the defendant's culture (in Minnesota, intercourse with a young woman under the age of 14 is prohibited, whether consensual or not). For instance, marriage to young women under the age of 14 is acceptable in many cultures, including Hmong. The prosecutor stated she would object to that as irrelevant, if offered by a defense attorney. But here

the state urges the *same kind of cultural evidence* be allowed to bolster a case against appellant.

We conclude the prejudicial effect of the expert testimony about Hmong males' tendency to dominate and abuse their wives, and the tendency of Hmong wives not to want to report assaults, far outweighed any probative value. We find the district court abused its discretion in qualifying the expert and admitting his testimony.

▪▪▪ Reversal is not required when an erroneous admission of objected-to evidence is harmless beyond a reasonable doubt. *State v. Bauer*, 598 N.W.2d 352, 367 (Minn.1999) (citation omitted). The United States Supreme Court has long recognized that the state bears the burden of showing an evidentiary error is harmless. *State v. Shoen*, 598 N.W.2d 370, 377 n. 2 (Minn.1999) (citing *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); *United States v. Olano*, 507 U.S. 725, 734–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967)). When the erroneous admission does not implicate constitutional rights, we will reverse if there is "a reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Post*, 512 N.W.2d 99, 102 n. 2 (Minn.1994).

▪▪ Admitting expert testimony always risks that the expert's opinions will inordinately influence the jury. *See, e.g., State v. Ritt*, 599 N.W.2d 802, 811 (Minn.1999) (citing *Myers*, 359 N.W.2d at 609–10), *cert. denied,* —— U.S. ——, 120 S.Ct. 1184, 145 L.Ed.2d 1090 (2000). The record shows appellant's conviction was based on disputed testimonial evidence. The outcome of the trial depended on whom the jury believed. By implying appellant's Hmong descent made him a probable spouse-abuser, the improper testimony clearly implied

a conviction should be forthcoming. In view of the severe risk of prejudice it posed, we cannot escape the conclusion that the improper testimony strongly influenced the jury's decision to convict.

We conclude that the state failed to meet its burden of proving harmless error. We reverse and remand for a new trial.[1]

## DECISION

The district court improperly allowed expert testimony on Hmong culture. The testimony was speculative, conjectural, and its prejudicial effect far outweighed any possible probative value.

**Reversed and remanded for a new trial.**

---

1. Because of our decision on the core issue of improper testimony, we do not address other issues raised by appellant.