STATE OF MINNESOTA

IN SUPREME COURT

A25-0420

Winona County                                                          McKeig, J.

State of Minnesota,

          Respondent,

vs.                                                                    Filed: April 29, 2026
                                                                       Office of Appellate Courts
Adam Taylor Fravel,

          Appellant.

———————————————

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Karin Sonneman, Winona County Attorney, Phillip D. Prokopowicz, Special Assistant County Attorney, Winona, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Greg Scanlan, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

———————————————

S Y L L A B U S

1.      Any error in the admission of multiple hearsay statements under Minnesota Rule of Evidence 807 regarding one incident of domestic abuse was harmless.

2.      The district court did not abuse its discretion by admitting expert testimony on commonalities in domestic violence relationships.

1

3.     The district court did not commit plain error by admitting the medical examiner's opinion that the cause of death was homicidal violence.

4.     Any misconduct that the prosecutor committed by asking questions eliciting expert testimony on sexual abuse in domestic violence relationships did not prejudice the defendant's substantial rights.

5.     Any misconduct that the prosecutor committed by misstating the proof-beyond-a-reasonable-doubt standard did not affect the defendant's substantial rights.

6.     The alleged cumulative errors did not deny the defendant a fair trial.

7.     The evidence at trial was sufficient to prove the defendant's extreme indifference to human life, premeditation, and intent to cause death.

Affirmed.

O P I N I O N

McKEIG, Justice.

After a jury trial, appellant Adam Taylor Fravel was found guilty of first-degree domestic abuse murder, first-degree premeditated murder, second-degree intentional murder, and second-degree felony murder for the death of Madeline Jane Kingsbury, his former girlfriend and the mother of his children. Kingsbury's body was found in a rural ditch over two months after she disappeared.

On direct appeal, Fravel asserts several trial errors and seeks a new trial based on each one. He also argues, in the alternative, for a new trial based on the alleged errors' cumulative effect. Finally, Fravel argues that the evidence was insufficient to prove the requisite intent for three of the four murder charges and asks us to vacate those guilty

2

verdicts on that basis; he does not challenge the sufficiency of the evidence for second-degree felony murder, a form of unintentional murder. Because we hold that Fravel is not entitled to a new trial on any of his claims and because the only reasonable inference supported by the circumstances proved—when viewed as a whole—is that Fravel premeditated and intended to cause Kingsbury's death and did so with extreme indifference to human life, we affirm.

## FACTS

On March 31, 2023, Kingsbury disappeared after dropping her children off at daycare in Winona, Minnesota. On June 7, 2023, Kingsbury's remains were found wrapped in a bedsheet in a ditch next to a minimum maintenance road in rural, neighboring Fillmore County. Fravel, Kingsbury's ex-boyfriend and the father of her children, was indicted by a Winona County grand jury on four counts: (1) first-degree domestic abuse murder in violation of Minn. Stat. § 609.185(a)(6); (2) first-degree premeditated murder in violation of Minn. Stat. § 609.185(a)(1); (3) second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1(1); and (4) second-degree felony murder in violation of Minn. Stat. § 609.19, subd. 2(1). Before trial, the parties litigated the admissibility of hearsay statements and expert witness testimony offered by the State, among other issues. At the lengthy jury trial, the State's evidence included law enforcement testimony about the extensive investigation, numerous statements Fravel made to officers, security camera footage, records of Kingsbury's and Fravel's texts, cell phone location data, and testimony from Kingsbury's family and friends about Fravel's abuse of Kingsbury. Additionally, the medical examiner testified about the autopsy

3

performed, including the cause and manner of death, and the State presented expert testimony on domestic abuse. The following facts were presented to the jury at trial:

The investigation into Kingsbury's murder began when one of her friends made a missing person report on March 31, 2023. That evening, officers searched Kingsbury's house in Winona and observed no indication of forced entry or physical struggle.

Investigators interviewed Fravel twice over the next two days. Fravel told them that on March 31, 2023, he and Kingsbury dropped their children off at daycare around 8 a.m. and returned home. Kingsbury began working from home and was still working when Fravel left the house around 10:30 a.m. in the van to bring items to store at his parents' house in the city of Mabel, south of Winona. Fravel told investigators that when he got to the area near the unincorporated town of Choice, just north of Mabel, he realized that he had loaded items that needed to go to their storage unit in Winona and not items he intended to bring to Mabel, so he turned around and returned home. Fravel told investigators that he had expected Kingsbury would have left for work in his sedan before he returned, but when he arrived the sedan was still in the driveway and Kingsbury was not home.[1]

Fravel denied any physical violence between himself and Kingsbury during their seven-year, on-and-off relationship, except when Kingsbury once threw a plate at him.

---

[1] On April 1, Fravel told officers it took him an hour and a half round trip from when he left the house until he returned; on April 2, he said it was one hour.

4

Fravel told investigators that he "was infatuated" with the Gabby Petito case[2] when it was in the news, and that he had approached Kingsbury from behind, "hugged" her, and stated, "you don't want to end up like Gabby Petito do you?" He characterized this as a stupid and inappropriate joke.

Fravel told investigators that he and Kingsbury mutually decided to separate two or three weeks before her disappearance. Fravel said that Kingsbury told him around that same time that she was spending time with S.S., Fravel's old fraternity brother. Fravel said that it hurt him a lot that Kingsbury had spent time with S.S. and initially lied to Fravel about it, and Fravel told Kingsbury he did not want her messaging S.S. while they were living together. Fravel told investigators that, despite their breakup, Fravel and Kingsbury "were very cordial" and "weren't hostile towards each other"; this was at odds with his other statements that in the preceding week Kingsbury had been "acting very weird" and was "very short and direct" and "hostile" towards him. Fravel conceded that on March 30, 2023, he "kind of hounded [Kingsbury]" and asked her "why are you acting so strange."

While searching Kingsbury and Fravel's house in Winona on April 1, 2023, investigators recovered Kingsbury's personal items in the living room just inside the front door, including a brown-and-white checkered coat with a cell phone in the pocket, a

---

[2] The "Gabby Petito case" refers to a 2021 murder case that received nationwide media coverage. According to news publications, Gabby Petito was on a cross-country road trip with her then-boyfriend when her family lost contact with her and reported her as a missing person. Weeks later, Petito's remains were found in a national park in Wyoming. It was later determined that she died by strangulation.

backpack containing two laptops, and a wallet with Kingsbury's driver's license and credit cards. Investigators saw grey bed sheets that matched the grey fitted bed sheet Kingsbury's remains were later found wrapped in. In the garage, investigators observed black tape matching the tape used to secure the grey sheet wrapped around Kingsbury's remains, scissors, and a bottle of rubbing alcohol.

In two bedrooms, investigators observed marks where the wall was missing paint where cameras had once been attached to the wall. Investigators also observed empty boxes for Wyze brand security cameras. Data from a Wyze brand security camera system connected to Kingsbury's and Fravel's cell phones showed that at least two cameras were operating at their house in 2023 and that the cameras captured images of a bedroom and the backyard in March 2023. The last time the Wyze system was operational was on March 29, 2023, when a "delete device" action initiated from Fravel's cell phone prevented the outdoor camera from gathering any more data.

Law enforcement obtained Kingsbury's Apple account data, including a photo taken on March 5, 2023. The photo depicted the bathroom of the house, including a towel that was consistent in color and pattern with the towel later found around Kingsbury's head.

Investigators retrieved cell phone location data for Kingsbury and Fravel's cell phones on March 31, 2023. From 7:57 to 8:14 a.m., both cell phones traveled from the house to the children's daycare and back again. Kingsbury's cell phone remained in the area of the house for the rest of the day. Fravel's cell phone remained in the area of the house from 8:14 a.m. to 4:14 p.m. From 4:14 to 4:21 p.m., Fravel's cell phone traveled to

daycare and from 4:21 to 5:14 p.m. it traveled south to Fravel's parents' house in Mabel, where it remained the rest of the day.

An activity tracker application on Kingsbury's cell phone last recorded physical activity at 8:13 a.m. on March 31, 2023. At 8:14 a.m., Kingsbury's cell phone sent a text message to her sister's cell phone and transferred $20 to Fravel's cell phone. At 8:15 a.m., 150 points were uploaded to a coffee shop application on Kingsbury's cell phone. There were no outgoing texts, phone calls, or other activity from Kingsbury's cell phone after 8:15 a.m. on March 31, 2023.

Investigators recovered video footage recorded by security cameras on March 31, 2023, from residences and businesses in Winona and along the driving route from Winona to Mabel. These videos captured the movements of Kingsbury's van and established that Fravel had adequate time to drive to and from where Kingsbury's remains were discovered and to hide her body. Collectively, the videos show the following: Fravel changing the license plates on the van in the driveway;[3] Fravel driving the van to the gas station, now with a license plate number registered to Fravel's sedan, not the van; the van returning from the gas station and backing into the house's driveway; the van leaving the house at 11:26 a.m.; the van traveling south past the southernmost camera location on Highway 43 in Rushford at 11:59 a.m.; the van returning, traveling north past the southernmost Highway 43 camera at 12:44 p.m.; and the van arriving back

---

[3]    In Fravel's principal brief, he concedes that he changed license plates on the van before leaving the house toward Highway 43 and that the van recorded by the residential and business cameras was his van.

at the house at 1:28 p.m. Forty-five minutes elapsed between the two times the southernmost Highway 43 camera captured the van, driving first southbound and then returning northbound.

An investigator drove this route and testified it took 26 minutes to drive at a normal speed from the southernmost camera location on Highway 43 to the location where Kingsbury's body was later discovered and back again. The investigator also estimated that the round-trip drive would have left 18 minutes for someone to unload her body and obscure it from view. The investigator's testimony established Fravel had enough time to travel to the location where Kingsbury's remains were found, unload her body, obscure it from view, and travel northbound again, based on this security camera footage.

Several of Kingsbury's family members and friends testified about Kingsbury and Fravel's relationship. They testified that Kingsbury and Fravel had separated several times in their seven-year relationship. Two witnesses testified to personally observing Fravel physically abuse Kingsbury, and four witnesses testified that they saw injuries on Kingsbury from Fravel's abuse, while other witnesses had not noticed such indicators on Kingsbury of physical abuse. Multiple witnesses also testified that Kingsbury told them about a specific incident in September 2021, discussed in more detail below: in front of their children, Fravel choked Kingsbury, pushed her down into the couch, and threatened to kill her by saying if she did not mind or was not careful, she would end up like Gabby Petito.

In December 2022, Kingsbury sent Fravel texts telling him she was done with the relationship because of how he treated her. Also in December 2022, Kingsbury and S.S., a college acquaintance with whom Kingsbury had reconnected on a dating application in 2021, became intimate. Kingsbury and S.S. continued to see each other every few weeks until Kingsbury's disappearance.

In mid-March, Kingsbury again decided to separate from Fravel, despite concerns that he would not let her leave with their two young children.[4] On March 25, 2023, Kingsbury searched "coming clean about cheating" on the internet. Kingsbury's family members and friends testified that, in the week before March 31, 2023, Fravel was following Kingsbury around the house, looming over her, making her feel uncomfortable, and asking her if she was texting S.S. and whether she was going to leave Fravel for another man and let another man raise Fravel's children. On March 30, 2023, Kingsbury went to her friend's residence and then to S.S.'s.[5] Fravel texted Kingsbury to ask why she had stopped sharing her location with him and told her she was being "very hostile today."

Investigators discovered Kingsbury's remains on June 7, 2023, 0.4 miles from the intersection of 198th Street and Highway 43, two miles south of the unincorporated town of Choice and eight to nine miles north of Mabel, in rural Fillmore County. 198th Street

---

[4]    Fravel told law enforcement that the separation was mutual, but Kingsbury's family and friends testified that Kingsbury told them it was her decision.

[5]    S.S. had a confirmed alibi for his whereabouts on March 31, 2023, from 9:00 a.m. until around 3:00 p.m.

is a public minimum maintenance gravel road leading to private property that is primarily used for hunting, fishing, and agriculture. Kingsbury's remains were found in a ditch, partially inside an unmarked culvert that went under 198th Street, and underneath logs and sticks. Her body was wrapped in a grey fitted sheet held together with black duct tape that matched the sheets and tape found at the house. She was fully clothed, and there was a blue and white towel wrapped around her head, consistent with the towel in the photo found on her phone.

The medical examiner performed an autopsy of Kingsbury's body the next day and testified that her body was "badly decomposed" with significant tissue loss obscuring whether there was any bruising on her body or injury to her neck. He testified that the towel was around her head such that, if it was placed there before she died, "[i]t could have obstructed her breathing." He opined that Kingsbury's death was caused by "homicidal violence."

After a lengthy trial, a jury found Fravel guilty on all counts and returned special verdicts finding that Fravel had concealed Kingsbury's body. Fravel raises several issues in this direct appeal.

**ANALYSIS**

I.

Fravel's first claim is that the district court abused its discretion by permitting the State to introduce Kingsbury's hearsay statements about a September 2021 incident in which Fravel strangled Kingsbury and threatened to kill her in front of her children (the "Gabby Petito incident") under the residual exception to the hearsay rule. We review "a

10

district court's evidentiary rulings for an abuse of discretion." *State v. Hallmark*, 927 N.W.2d 281, 291 (Minn. 2019) (citation omitted) (internal quotation marks omitted). "A district court abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record." *State v. Guzman*, 892 N.W.2d 801, 810 (Minn. 2017). If we determine that the district court erroneously admitted evidence, reversal is only warranted when there is a "reasonable possibility that the wrongfully admitted evidence significantly affected the verdict." *State v. Robinson*, 718 N.W.2d 400, 407 (Minn. 2006).

Hearsay, an out-of-court statement "offered in evidence to prove the truth of the matter asserted," is inadmissible unless it falls under an exception. Minn. R. Evid. 801(c), 802; *Bobo v. State*, 820 N.W.2d 511, 519 n.6 (Minn. 2012). If a hearsay statement is not covered under a specific exception, it may be admissible under the "residual exception." Minn. R. Evid. 807 (requiring the statement to have "circumstantial guarantees of trustworthiness" and meet three additional requirements).[6] A district court must conduct a two-step analysis before admitting hearsay statements under this residual exception. *Hallmark*, 927 N.W.2d at 292; *State v. Vangrevenhof*, 941 N.W.2d 730, 735 (Minn. 2020).

---

[6]     Minnesota Rule of Evidence 807 provides, in relevant part, the following:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

11

First, the district court considers the totality of the circumstances "surrounding the making of the statements" to assess "whether the hearsay statement has circumstantial guarantees of trustworthiness." *Hallmark*, 927 N.W.2d at 292 (citation omitted) (internal quotation marks omitted). These circumstances may include whether the statement was made voluntarily, under oath, and subject to cross-examination; the declarant's relationship to the witnesses or parties; the declarant's motivation to give the statement; "whether the declarant ever recanted the statement"; the existence of evidence corroborating the matter asserted in the statement; and the declarant's character for truthfulness. *Id.* (quoting *State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013)) (internal quotation marks omitted).

Second, the district court determines whether the statement meets the three enumerated requirements in Rule 807. *Id.* at 293. The only requirement at issue in this case is that the statement must be "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Minn. R. Evid. 807(B). The statement offered "need not be 'essential' to satisfy" this requirement; the question is "whether other admissible evidence on the same point could be obtained through reasonable efforts." *Hallmark*, 927 N.W.2d at 294 (quoting *State v. DeRosier*, 695 N.W.2d 97, 106 (Minn. 2005)).

Here, in pretrial hearings, the State offered testimony from Kingsbury's family members and friends regarding Kingsbury's statements to them about the Gabby Petito incident. These witnesses testified that Kingsbury told them that in September 2021, in front of their children, Fravel choked Kingsbury, pushed her down into the couch, and

12

told her if she did not mind or was not careful, she would end up like Gabby Petito, who was murdered by her boyfriend in a high-profile case in the media.

The State sought to admit these out-of-court statements at trial under Rule 807. Fravel objected to the statements as inadmissible hearsay, arguing that the out-of-court statements were not more probative than other evidence, including two text message conversations that the State intended to introduce. The district court overruled Fravel's objections, except as to one witness,[7] finding Kingsbury's statements properly fell under the residual exception. In its ruling, the district court accurately cited Rule 807 and analyzed both steps consistent with the rule and our case law.

At trial, consistent with the district court's ruling, eight witnesses testified regarding Kingsbury's statements about the Gabby Petito incident: that in September 2021, in front of their children, Fravel choked Kingsbury, pushed her down into the couch, and told her if she did not mind or was not careful, she would end up like Gabby Petito. Two of the witnesses, Kingsbury's father and stepmother, also testified that after learning about the incident, they drove to Winona, brought Kingsbury and the two children back to Kingsbury's father and stepmother's home, and encouraged Kingsbury to report the incident to the police. Kingsbury's stepmother testified that she noticed a red mark on Kingsbury's neck and that, over time, Kingsbury seemed to downplay the incident. After a few days, Kingsbury and the children returned to Fravel, and they

---

[7] The district court sustained Fravel's objection as to S.S.'s testimony regarding Kingsbury's statements about the Gabby Petito incident in part because there was a longer "time lapse between the alleged event and the[] hearsay statements" to S.S. compared to the other witnesses.

continued their relationship. Kingsbury told her parents that she wanted the children to be with their dad and that Fravel said it was a joke and that he would not do it again.

In addition to the eight witnesses' testimony, the State also introduced two text message conversations describing this incident: one between Kingsbury and Fravel on September 21, 2021, and one between Kingsbury and her friend K.K. in December 2022. In the texts to Fravel, Kingsbury stated, "You know I'm not really okay with or over the fact that you put your hand around my neck and pushed me down in front of the kids earlier so don't," followed by, "Not okay with it all but especially with them there." Fravel said, "You'll adjust," to which Kingsbury responded, "The f*** I will" and "You do that again without asking me and you can go somewhere else." Fravel then said, "You got it mother," and Kingsbury responded, "Don't patronize me that crossed a line." Fravel stated, "Then mind," to which Kingsbury said, "Stop." In the messages between Kingsbury and K.K., Kingsbury wrote, "After he joked about me ending up like gabby petito if I don't learn to 'mind'. It wasn't funny."

On appeal, Fravel argues that the district court abused its discretion in admitting Kingsbury's statements under the residual exception because the statements were not more probative than other evidence of the Gabby Petito incident.

Fravel also argues that Kingsbury's statements significantly affected the verdict because the Gabby Petito incident constituted a majority of the "past pattern" evidence and tainted everything else that the jurors heard. One of the elements of first-degree domestic abuse murder is that "the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member." Minn. Stat.

§ 609.185(a)(6). Such a "past pattern requires at least two prior acts of domestic abuse." *State v. Bilbro*, 24 N.W.3d 827, 834 (Minn. 2025). Fravel also alleges that Kingsbury and Fravel at some point engaged in consensual choking as part of their sexual relationship and asserts that, without this context, Kingsbury's statements about the Gabby Petito incident prejudiced Fravel and created a reasonable possibility that the verdict would have been different had those statements been excluded.

We need not decide whether admitting Kingsbury's hearsay statements regarding the Gabby Petito incident was an abuse of discretion because we conclude that any error in the admission of these statements was harmless. There is no reasonable possibility that the wrongfully admitted evidence significantly affected the verdict in this case. *See Robinson*, 718 N.W.2d at 407. Although several of Kingsbury's out-of-court statements about the Gabby Petito incident were admitted at trial, they all described the same singular incident of past domestic abuse. But critically, there was evidence introduced at trial of numerous other instances where Fravel physically abused Kingsbury: in February 2021, Kingsbury's friend observed Fravel backhand Kingsbury across the face; in November 2022, a different friend observed Fravel shove Kingsbury into a wall or refrigerator; two friends separately observed bruising on Kingsbury's neck at times other than September 2021; and another friend testified that Kingsbury told her that Fravel had pushed Kingsbury into the wall. As such, Fravel's argument that the Gabby Petito incident constituted a majority of the "past pattern" evidence is without merit.

Further, we reject Fravel's argument that this evidence was not harmless because it lacked context that Kingsbury and Fravel allegedly engaged in consensual choking.

15

Fravel's argument is difficult to follow and weakly supported. The only basis in the record for Fravel's assertion that they engaged in consensual choking is Kingsbury's 2018 statement to a friend that Kingsbury had a neck bruise because "things got out of hand in the bedroom," and the text Kingsbury sent to Fravel after the Gabby Petito incident: "You do that again without asking me and you can go somewhere else." These texts provide weak support for Fravel's argument; the statement "things got out of hand in the bedroom" does not necessarily imply consent and, as the State argues, Fravel's texts to Kingsbury after the Gabby Petito incident show that this incident was not a joke or attempt at sexual foreplay. Even if these facts supported Fravel's theory that Kingsbury and Fravel at times engaged in consensual choking, these facts were presented to the jury, providing the context that Fravel asserts was lost by admitting Kingsbury's statements. As such, there is not a reasonable possibility that the verdict would have been different had those statements been excluded.

Based on the facts of this case, we conclude that, even if the district court abused its discretion by admitting the hearsay statements, there is not a reasonable possibility that the admission of Kingsbury's statements significantly affected the verdict.

II.

Next, Fravel argues that the district court abused its discretion by allowing the State to introduce expert testimony on commonalities in domestic violence relationships. Like other evidentiary rulings, we "review the admission of expert testimony for abuse of discretion." *State v. Heller*, 12 N.W.3d 452, 466 (Minn. 2024). If the court's "admission

16

of evidence was in error, such admission is harmless if it did not significantly impact the verdict." *Id.*

Expert testimony must meet the requirements of Minn. R. Evid. 702, which states in pertinent part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. The opinion must have foundational reliability.

To be admissible, "[e]xpert testimony must be helpful to the jury." *Heller*, 12 N.W.3d at 466 (citation omitted) (internal quotation marks omitted). "Expert testimony is not helpful if the expert opinion is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions." *State v. Obeta*, 796 N.W.2d 282, 289 (Minn. 2011) (citation omitted) (internal quotation marks omitted).

Expert testimony must also have "foundational reliability" to be admissible. Minn. R. Evid. 702. To determine whether an expert opinion is "foundationally reliable under Rule 702," the district court must evaluate the testimony in light of its purpose and "consider the underlying reliability, consistency, and accuracy of the subject about which the expert is testifying." *State v. Garland*, 942 N.W.2d 732, 742 (Minn. 2020) (citation omitted) (internal quotation marks omitted). Foundational reliability "looks to the theories and methodologies used by an expert." *Id.* (citation omitted) (internal quotation marks omitted). Even if expert testimony is helpful and reliable, it may nevertheless be excluded "if its probative value is substantially outweighed by the danger of unfair

17

prejudice, confusion, or misleading the jury" under Minn. R. Evid. 403. *Heller*, 12 N.W.3d at 466 (citation omitted) (internal quotation marks omitted).

We held in *State v. Hennum* that expert testimony on battered woman syndrome is admissible because "the theory underlying the battered woman syndrome … has gained a substantial enough scientific acceptance to warrant admissibility" and the testimony "would help to explain a phenomenon not within the understanding of an ordinary lay person." 441 N.W.2d 793, 798–99 (Minn. 1989). We limited such testimony "to a description of the general syndrome and the characteristics which are present in an individual suffering from the syndrome." *Id.* at 799. In *State v. Grecinger*, we affirmed the admission of expert testimony about the symptoms and behaviors that women suffering from this syndrome may exhibit. 569 N.W.2d 189, 193, 197 (Minn. 1997). Fourteen years later, in *State v. Obeta*, we applied the same logic to hold that expert testimony about counterintuitive behaviors of adult victims of sexual assault is admissible where consent is at issue. 796 N.W.2d at 291–94.

Here, the State offered testimony from an expert witness on commonalities in domestic violence relationships. The expert's qualifications included over 20 years working with domestic violence victims and offenders and assisting and training police officers. The expert had a bachelor's degree and a master's in public administration. She had not reviewed the facts of this case; instead she testified as to her specialized knowledge regarding characteristics commonly observed in victims of domestic violence. The expert testified that though she tried to "keep up with the research" on domestic

18

violence and abuse, she primarily relied on her "own specialized knowledge from [her] own experience" when testifying.

In her pretrial testimony, the expert discussed commonalities among domestic violence relationships. She defined domestic violence, in part, as "a relationship of dominance." She stated that victims tend to tell trusted family members and friends before reporting abuse to police, which is typically a last resort. The expert testified that a victim may not report domestic violence if the victim is committed to staying with the abuser or if the victim fears losing custody of shared children. She discussed reasons why a victim would retract or minimize their prior statements to others about abuse, including when the victim shares children with the abuser. The expert also testified about reasons a victim would stay in an abusive relationship, including to maintain stable housing or finances or due to the victim's self-doubt or isolation from other relationships. Throughout her testimony, the expert qualified her answers, emphasizing that "it depends" on the relationship and that no two relationships are the same.

After the expert's pretrial testimony, Fravel moved to exclude the expert's testimony, arguing it was unhelpful, irrelevant, and overly prejudicial. The district court, citing *Hennum*, found the expert reliable based on her work experience in domestic violence and knowledge of clinical and research literature in the field. The district court further concluded that the expert's testimony "may help explain" to the jury "a phenomenon not within the understanding of an ordinary lay person" and "assist the jury in its determinations as to the presence of a past pattern of domestic violence and the trustworthiness of … Kingsbury's statements related to past instances of domestic abuse."

19

The court granted the State's motion to call the expert at trial, limiting her testimony "to describing the symptoms, experiences of abused individuals, and the characteristics of domestic violence" and "the nature of domestic violence and battered women's syndrome and its general effect." The court stated that the expert "may not testify about whether the victim [in this case] suffers from battered woman syndrome." At trial, the expert testified to largely the same topics as in pretrial.

Fravel disputes the expert's qualifications and her testimony's foundational reliability, the helpfulness of the testimony, and the relevance of counterintuitive behaviors of domestic violence victims.[8] These arguments that the district court abused its discretion in allowing the testimony are unavailing because the expert was qualified and the testimony was foundationally reliable, helpful to the jury, and relevant.

First, the district court did not abuse its discretion in finding the expert qualified to testify about the commonalities of domestic violence relationships based on her years of experience working with victims and offenders and her knowledge of research literature, which is expressly permitted under the rule. Minn. R. Evid. 702 (noting a witness can be

---

[8]    Fravel also argues that the district court cannot both find that Kingsbury's hearsay statements have "circumstantial guarantees of trustworthiness and then admit [the expert]'s testimony because it would help bolster [Kingsbury]'s credibility in light of 'counterintuitive behaviors.' " Fravel conflates two separate credibility determinations: the district court evaluates whether a hearsay statement has circumstantial guarantees of trustworthiness to determine admissibility of the statement under Rule 807, while the *jury* evaluates Kingsbury's credibility to determine whether her statements about Fravel's abuse were truthful. *See State v. Anderson*, 789 N.W.2d 227, 237 (Minn. 2010) (noting the district court "act[s] as a gatekeeper for the admissibility of evidence"); *State v. Fleck*, 777 N.W.2d 233, 236 (Minn. 2010) ("The jury is in the best position to weigh credibility and thus determines which witnesses to believe and how much weight to give to their testimony.").

20

"qualified as an expert" based on "knowledge, skill, experience," and "training," as well as education).

Second, the expert's testimony was also foundationally reliable. We have held that expert testimony on counterintuitive victim behaviors in the context of both battered woman syndrome and sexual assault is admissible and foundationally reliable. *See Hennum*, 441 N.W.2d at 798–99; *Grecinger*, 569 N.W.2d at 193–95; *Obeta*, 796 N.W.2d at 294. In *Obeta*, we held that, in a sexual assault case where consent is at issue, an expert can testify to typical counterintuitive victim behaviors, including "delayed reporting, lack of physical injuries, and submissive conduct." 796 N.W.2d at 294. In *Grecinger*, we upheld the admission of expert witness testimony that "symptoms of a woman suffering from battered woman syndrome *can* include feelings of terror, acceptance of blame for the battering, a negative self-image, isolation, denial or minimization of the abuse, and depression" and that "*many* battered women do not report the abuse out of fear for their safety, denial of the abuse, fear that no one will listen, or hope that the batterer will change." 569 N.W.2d at 193 (emphases added). Although here there were no allegations of sexual assault and neither the expert nor the prosecutor here used the words "battered woman syndrome" at pretrial or trial, the reasoning of *Hennum*, *Grecinger*, and *Obeta* apply with equal force to counterintuitive domestic violence victim behaviors. Here, the expert testified about many of the same topics as the expert in *Grecinger* and similarly qualified her statements that some, but not all, victims of domestic violence share common experiences or exhibit common counterintuitive behaviors like minimizing and normalizing abuse and choosing to stay with their abuser.

21

Finally, the district court did not abuse its discretion by finding that the expert's testimony "will assist the jury in its determinations as to the presence of a past pattern of domestic violence and the trustworthiness of … Kingsbury's statements related to past instances of domestic abuse." Kingsbury exhibited counterintuitive behaviors, including minimizing the Gabby Petito incident to her parents, returning to Fravel after that incident and remaining with him despite other abuses, and choosing not to report abuse to the police. We have held that expert testimony on battered woman syndrome and sexual assault victims helps "explain a phenomenon not within the understanding of an ordinary lay person" and because it "dispel[s] the common misconception that a normal or reasonable person would not remain in such an abusive relationship." *Hennum*, 441 N.W.2d at 798; *see also Grecinger*, 569 N.W.2d at 195; *Obeta*, 796 N.W.2d at 293–94. The district court accurately cited our case law and its analysis is supported by the record, and therefore its ruling was consistent with the law and not contrary to the evidence. *Guzman*, 892 N.W.2d at 810. Thus, the district court did not abuse its discretion by admitting the expert testimony under Rule 702.

### III.

Fravel's third claim on appeal is that the medical examiner's testimony attributing Kingsbury's death to homicidal violence impermissibly addressed intent and, according to Fravel, amounted to plain error. Fravel did not object to this testimony at trial.

"When a defendant fails to object at trial" to the admission of testimony, "the forfeiture doctrine generally precludes appellate relief." *State v. Lilienthal*, 889 N.W.2d 780, 784 (Minn. 2017). But we may correct an error not objected to at trial if the

defendant shows that there was "(1) error; (2) that was plain; and (3) that affected [the defendant's] substantial rights" such that it "depriv[ed] the defendant of a fair trial." *Id.* at 785; *State v. Tscheu*, 758 N.W.2d 849, 863 (Minn. 2008) (citation omitted) (internal quotation marks omitted). "An error is plain if it was clear or obvious." *Lilienthal*, 889 N.W.2d at 785 (citation omitted) (internal quotation marks omitted). An error affects the defendant's substantial rights if "there is a reasonable likelihood the error had a significant effect on the verdict." *State v. Davis*, 820 N.W.2d 525, 535 (Minn. 2012) (citation omitted) (internal quotation marks omitted). If the three prongs are met, we then "evaluate[] whether reversal is required to ensure the fairness, integrity, or public reputation of the judicial proceedings." *State v. Coleman*, 957 N.W.2d 72, 77 (Minn. 2021) (citation omitted) (internal quotation marks omitted).

Expert testimony from a psychiatrist or pathologist regarding the "ultimate question of whether in fact the defendant had the requisite mens rea when he committed the crime" is inadmissible. *State v. Chambers*, 507 N.W.2d 237, 238–39 (Minn. 1993) (citation omitted) (internal quotation marks omitted). Thus, a district court errs by allowing that expert to testify to the defendant's intent. *Id.* at 239 (holding the error was not prejudicial).

The medical examiner testified about the autopsy he performed of Kingsbury's body the day after her remains were discovered. Her body was "badly decomposed" with significant tissue loss obscuring whether there was any bruising to Kingsbury's body or injury to her neck. There was no evidence of "any physical injury on the body," "no obvious broken bones or gashes" that could not be explained by decomposition, and "no

23

evidence of any internal bleeding" or "any significant natural disease." The medical examiner testified that a towel was "wrapped tightly around the head," covering "the chin, the mouth, the nose and the eyes," and "tied in a slip knot." He testified that if the towel was placed there before she died "[i]t could have obstructed her breathing." He explained that asphyxiation was a "lack of oxygen" that can be caused by blocked airways, inability to expand the chest, and strangulation, and opined that an "asphyxia cause of death is the most likely" here.

The medical examiner then explained that he can determine cause of death as "disease or injury" and "give an opinion as to manner of death," which falls into one of five categories: "accident, suicide, homicide, natural causes, and undetermined." He clarified that these are medical determinations, not legal ones, based on the "circumstances of death, medical history, medical records," and other factors. The testimony continued as follows:

> Prosecutor: And for … those categories that you can use, what does homicide mean?
>
> M.E.: Homicide means medically, the death at the hands of another person.
>
> P.: And again, that is not a legal conclusion. That is a medical term?
>
> M.E.: It is not a legal conclusion. It does not necessarily mean murder. It means homicide death at the hands of another person.
>
> P.: And within the bounds of a reasonable degree of medical certainty, have you formed an opinion concerning the cause of death for … Kingsbury?

M.E.: Yes.

P.: What is that opinion?

M.E.: My opinion of the cause of death, it was homicidal violence.

P.: How did you reach that conclusion?

M.E.: Well, based on the circumstances of death, the finding of the body and the appearance of the body, it was my opinion with reasonable degree of medical certainty, that she died at the hands of another person. I did not know the exact mechanism, whether it was a form of asphyxia or what the mechanism was, but I thought it was death at the hands of another person, and I called it homicidal violence.

Fravel did not object to this opinion at trial. He now argues that the district court committed plain error by not sua sponte excluding the medical examiner's statement that the cause of Kingsbury's death was homicidal violence because this statement implied to the jury the intent of the person who caused Kingsbury's death. Fravel asserts that the jury understood the term "violence" to include a purpose to cause injury, such that the jury would hear the medical examiner's opinion as an expert inference that Fravel exerted physical force for the purpose of causing death. Accordingly, Fravel argues, the admission of the medical examiner's opinion that the cause of Kingsbury's death was homicidal violence was plain error under *Chambers*.

We conclude that the district court did not plainly err by admitting the medical examiner's testimony that the cause of Kingsbury's death was homicidal violence because, even if it was an error, it was not "clear or obvious." *See Lilienthal*, 889 N.W.2d at 785 (citation omitted) (internal quotation marks omitted). "An error is clear or obvious if it contravenes case law, a rule, or a standard of conduct." *State v. Sanchez-Sanchez*,

25

879 N.W.2d 324, 330 (Minn. 2016) (citation omitted) (internal quotation marks omitted). We have never held that a medical examiner may not testify that the cause of a victim's death was "homicidal violence," and there is no statute or rule prohibiting this testimony.

Fravel argues that the admission of the medical examiner's opinion contravenes *Chambers*, but *Chambers* is distinguishable. There, the pathologist testified specifically to the intent behind the victim's injuries by opining that the victim's wounds "were meant to cause the subject's death." *Chambers*, 507 N.W.2d at 238. Here, the medical examiner did *not* testify specifically about the ultimate question of intent by classifying the cause of death as homicidal violence. The term "violence" can include a purpose or intent to cause harm, but can also refer to the forcefulness, intensity, or destructiveness of a force or action. *See Merriam-Webster's Collegiate Dictionary* 1396 (11th ed. 2020) (defining "violence" as "1a: exertion of physical force so as to injure or abuse … b: an instance of violent treatment or procedure 2: injury by or as if by distortion, infringement, or profanation … 3a: intense, turbulent, or furious and often destructive action or force"). Thus, while there is no question that the pathologist's opinion in *Chambers* spoke directly to the perpetrator's intent, it is much less clear here.

Even if we assume that the medical examiner's opinion was admitted in error, the error was not plain. We have considered several cases in which a medical examiner testified that the cause of death was "homicidal violence," including *State v. Bartylla*, 755 N.W.2d 8, 12 (Minn. 2008), *State v. Sirvio*, 579 N.W.2d 478, 481 (Minn. 1998), and *State v. Marhoun*, 323 N.W.2d 729, 730–31 (Minn. 1982), and the admissibility of that opinion was not contested. Because we have never held that a medical examiner cannot

26

opine that the cause of death was "homicidal violence" and there is no source of law prohibiting this testimony, any error in admitting that testimony was not clear or obvious and, thus, not plain. *See Sanchez-Sanchez*, 879 N.W.2d at 330. The district court's admission of the medical examiner's testimony was not plain error. *See Lilienthal*, 889 N.W.2d at 785.

IV.

Fravel's fourth argument is that the prosecutor committed misconduct by eliciting testimony from the domestic violence expert about sexual abuse in domestic violence relationships because the prosecutor did not proffer this testimony at pretrial, the court did not rule it admissible, and it amounted to impermissible character evidence. Fravel did not object to this testimony at trial.

When the defendant does not object to the prosecutor's alleged trial misconduct, we apply "the modified plain-error test." *State v. Portillo*, 998 N.W.2d 242, 248 (Minn. 2023). Under this test, the defendant first "has the burden to demonstrate that the misconduct constitutes (1) error, (2) that was plain." *Id.* (citation omitted) (internal quotation marks omitted). If the defendant establishes error that is plain, "the burden then shifts to the State to demonstrate that the error did not affect the defendant's substantial rights." *Id.* (citation omitted) (internal quotation marks omitted). An error affects a defendant's substantial rights "if there is a reasonable likelihood that the absence of misconduct would have had a significant effect on the jury's verdict." *State v. Davis*, 735 N.W.2d 674, 681–82 (Minn. 2007). If the State fails to meet its burden at the second step, we then evaluate whether the error should be addressed "to ensure fairness and the

27

integrity of the judicial proceedings." *Id.* (citation omitted) (internal quotation marks omitted).

At the grand jury proceedings, a juror asked the expert, "Do victims often normalize violence in their sexual relationships?" The expert answered that victims have told her "well, this is just what sex is" and that, after victims described a past sexual experience to the expert, she asked the victims if they "want[ed] to have that happen" and the victims told her "no." The juror then asked, "Do [victims] sometimes request violence in those relationships?" The expert responded that if victims anticipate the violence, they might ask for it to "just get it over with."

In the pretrial proceedings, the expert discussed dominance but not sexual abuse or violence. She defined a relationship of domestic violence in part as one "of dominance" where the "dominant person" "maintain[s] that position through violence or threats."

During trial, the expert stated that victims often normalize the emotional abuse that they suffer. The prosecutor then asked the expert, "can that include normalizing violence in the sexual relationship?" The expert answered that she has seen the "relationship of dominance" that exists in these types of relationships "enter[] the bedroom" and victims are "scared to speak up" when "their partner wants them to do things that [the victims] don't want to do," including "reenact[ing] pornographic acts" involving violence to the victims. Fravel did not object to the prosecutor's questions or the resulting testimony at trial. After closing arguments, the district court instructed the jury that the State offered the expert's testimony "for the limited purpose of describing" commonalities among domestic abuse victims and that "[t]he admission of this testimony

28

does not mean that … Kingsbury suffered the domestic abuse" as that is a "fact question[]" for the jury to decide."

Fravel argues that the prosecutor committed plain error by eliciting expert testimony on sexual abuse in domestic violence relationships because the prosecutor did not proffer this testimony during the pretrial hearing regarding the admissibility of the expert's testimony and the court did not rule it admissible, in violation of Minnesota Rule of Criminal Procedure 9.01, subdivision 1(4)(c).[9] Fravel also contends that the expert's testimony amounted to impermissible propensity evidence of Fravel's character, citing to our cases on eliciting impermissible character evidence, including testimony that the defendant fit a drug courier profile (*State v. Williams*, 525 N.W.2d 538, 545, 548 (Minn. 1994)), testimony that the defendant possessed pornographic images (*State v. Jaros*, 932 N.W.2d 466, 474 (Minn. 2019)), and the prosecutor's inflammatory descriptions of the defendant (*State v. Morgan*, 51 N.W.2d 61, 62 (Minn. 1952)).[10]

---

[9]      Minnesota Rule of Criminal Procedure 9.01, subd. 1(4)(c), states

[a] person who will testify as an expert but who created no results or reports in connection with the case must provide to the prosecutor for disclosure to the defense a written summary of the subject matter of the expert's testimony, along with any findings, opinions, or conclusions the expert will give, the basis for them, and the expert's qualifications.

[10]      Fravel also cites to a court of appeals opinion holding expert testimony "asserting that Hmong men tend to abuse their wives … directly implied to the jury that because defendant was Hmong, he was more likely to have assaulted his wife" and was inadmissible. *State v. Vue*, 606 N.W.2d 719, 723 (Minn. App. 2000). Unlike *Vue*, here the expert did not testify to any immutable characteristics, like race, of any offenders or victims of domestic or sexual violence. *See id.*

     Fravel also argues that because the prosecutor told the district court, in the presence of defense counsel, that "there was no evidence of sexual abuse in this case,"

Assuming without deciding that the prosecutor committed plain error by eliciting the expert testimony about sexual abuse, we hold that doing so was harmless. Here, unlike in *Williams* and *Jaros*, the prosecutor did not elicit and the expert did not provide testimony about Fravel. *Williams*, 525 N.W.2d at 545 (noting officers testified that the defendant fit a "drug courier profile"); *Jaros*, 932 N.W.2d at 472 (noting the witness testified that the defendant had pornographic images on his cell phone). Unlike in *Morgan*, where the prosecutor in final argument described the defendant in such a way as to "inflam[e] the jury's passion and prejudice against" the defendant, the expert here did not describe Fravel in any way. 51 N.W.2d at 63. Additionally, the district court instructed the jury on the limits of the expert's testimony, and "[w]e assume that the jury followed the court's instructions." *State v. Vang*, 774 N.W.2d 566, 578 (Minn. 2009). Under these facts, there is not a reasonable likelihood that the absence of this testimony would have had a significant effect on the jury's verdict. As such, we conclude that, even if the prosecutor's questions constituted plain error, they did not affect Fravel's substantial rights.

---

that eliciting the expert's testimony regarding sexual abuse in domestic violence relationships amounted to "false testimony" under *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (holding that "knowingly solicit[ing] false testimony" violates the Due Process Clause of the Fourteenth Amendment). Unlike the false testimony in *Glossip*, the expert's testimony here contained no false assertion about any facts in this case, and there is no indication that the expert testimony that victims of domestic violence sometimes experience sexual abuse is untrue. Therefore, Fravel's "false testimony" argument is unfounded.

V.

Fravel's fifth claim is that the prosecutor committed misconduct in closing argument by misstating the State's burden of proof. Fravel did not object to the alleged misstatements of law at trial. Thus, we apply the same modified plain-error test as described above.

An error is plain if it is "clear or obvious," and the error "is clear or obvious if it contravenes case law, a rule, or a standard of conduct." *Sanchez-Sanchez*, 879 N.W.2d at 330 (citation omitted) (internal quotation marks omitted). When assessing whether it is reasonably likely that the plain error "would have had a significant effect on the jury's verdict, we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions." *Davis*, 735 N.W.2d at 682.

Prosecutors may not materially misstate the law in closing arguments. *State v. Matthews*, 779 N.W.2d 543, 553 (Minn. 2010). Courts look to the context of the claimed errors in closing argument, including the context of the whole trial. *See, e.g.*, *State v. Bolstad*, 686 N.W.2d 531, 544 (Minn. 2004); *State v. Strommen*, 648 N.W.2d 681, 690 (Minn. 2002). A prosecutor's closing argument, "though inartful, did not constitute misconduct" when it did not explicitly misstate the burden of proof. *State v. Fields*, 730 N.W.2d 777, 786 (Minn. 2007).

Fravel argues that the prosecutor committed misconduct by telling the jury it could have some "lingering doubt" and still find Fravel guilty beyond a reasonable doubt. During the State's closing argument, the prosecutor told the jury to "listen very closely to

31

the Judge's instructions to you on what proof beyond a reasonable doubt is." He then

defined proof beyond a reasonable doubt as follows:

> Proof beyond a reasonable doubt, as the Judge will tell you, is that you approach the decision as you do some of the most important affairs of your life. It does not mean any fanciful or capricious doubt. That if you have doubt, it's based upon reason and common sense. It does not mean beyond all possibility of doubt.

> As we go through life … we have a lot of life experiences, a lot of important decisions that we make. It may be a career change, moving the family, maybe a major medical procedure, could be the purchase of a home, marriage, becoming a mother or a father. Often when we make these decisions in our life … we do have some lingering doubts. Should I get a second opinion? Is this the right move for myself and my career and my family? … But even though we have those lingering doubts, we move forward with the decision because based upon the information that we have at that time, we have the confidence that it is the right decision. And that is what proof beyond a reasonable doubt means.

In its closing argument, the defense counsel articulated proof beyond a reasonable

doubt in part as requiring that "all reasonable doubts have to be vanquished from your

mind." The State objected to this phrasing as a "misstatement of the law," and the district

court overruled the objection.

In rebuttal, the prosecutor told the jury to "listen closely" to the court's instruction

and previewed that the court would not give an instruction requiring the jury to "vanquish

all reason of [sic] doubt," but instead would tell the jury that "proof beyond a reasonable

doubt does not mean beyond all possibility of doubt." Defense counsel did not object, and

the prosecutor made no further statements about "lingering doubts."

After the final arguments, the district court instructed the jury on the proof-

beyond-a-reasonable-doubt standard as follows:

Proof beyond a reasonable doubt is such proof as ordinarily prudent people would act upon in their most important affairs. A reasonable doubt is a doubt based on reason and common sense. It does not mean a fanciful or capricious doubt, nor does it mean beyond all possibility of doubt.

Fravel asserts that the prosecutor misstated proof beyond a reasonable doubt by telling the jury they could reach a verdict even with "lingering doubts" which, without qualification, could include lingering reasonable doubts. Fravel argues that the prosecutor's misstatement of proof beyond a reasonable doubt is like the prosecutorial misconduct in *Portillo*, where we concluded the prosecutor erred by stating in closing argument that the defendant "no longer had the presumption of innocence." 998 N.W.2d at 250.

Fravel also contends that, as in *Portillo*, the State's evidence against him is not strong and, accordingly, this error requires a new trial. *See id.* at 254 (concluding "[t]he State's case against Portillo was not strong" and "a reasonable likelihood exists that the prosecutor's misstatement may have had a significant effect on the verdict of the jury").

Although the prosecutor's "lingering doubts" comments were inartful and imprecise, this case is different from *Portillo* because here the State has met its burden to show that the prosecutor's misstatement of the burden of proof did not affect Fravel's substantial rights. Even assuming the prosecutor's misstatement of the burden of proof was plain error, that error did not affect Fravel's substantial rights under *Davis* because it is not reasonably likely that the absence of this misstatement would have significantly affected the jury's verdict. 735 N.W.2d at 682. Unlike *Portillo*, where we concluded that "the evidence of guilt … was not strong," the evidence against Fravel—as discussed

33

more fully below in addressing the sufficiency of the evidence—is strong. 998 N.W.2d at 252–53. The prosecutor's improper statement that the jury could convict even with "lingering doubts" was not pervasive; the prosecutor's comments on the reasonable-doubt standard largely mirrored or permissibly explained the district court's instructions, and the prosecutor twice told the jury to "listen closely" to the district court's instructions regarding the proof-beyond-a-reasonable-doubt standard. *See State v. Jackson*, 773 N.W.2d 111, 122–23 (Minn. 2009) (concluding the prosecutor gave "a legitimate explanation of the State's burden"). The defense counsel took the opportunity to rebut the prosecutor's characterization of the reasonable doubt standard in his closing argument, stating that "all reasonable doubts have to be vanquished from your mind." Accordingly, even assuming that the prosecutor's misstatement of the burden of proof was plain error, the misconduct did not affect Fravel's substantial rights.

VI.

Fravel next argues that he should be granted a new trial based on the cumulative effect of the alleged trial errors. "[I]n rare cases where the errors, when taken cumulatively, have the effect of denying [the defendant] a fair trial," the defendant "may be entitled to a new trial." *State v. Fraga*, 898 N.W.2d 263, 278 (Minn. 2017) (citation omitted) (internal quotation marks omitted). When considering whether this is such a case, "we look to the egregiousness of the errors and the strength of the State's case." *Id.* "[W]e are more inclined to order a new trial for cumulative errors in very close factual cases." *Id.* at 279.

This is not the rare case where the cumulative effect of the alleged errors deprived the defendant of a fair trial. *See id.* at 278. We have already concluded that three alleged errors—admitting Kingsbury's hearsay statements about the Gabby Petito incident, eliciting expert testimony on sexual abuse in domestic violence relationships, and misstating the proof-beyond-a-reasonable-doubt standard—did not, each on their own, significantly affect the jury's verdict. We similarly conclude that these alleged errors, when viewed together, did not significantly affect the verdict. The State introduced evidence of Fravel's multiple abuses of Kingsbury outside of the Gabby Petito incident. The prosecution never argued that Fravel sexually abused Kingsbury. And while the prosecutor's comments on the reasonable-doubt standard were inartful and imprecise, they were not pervasive and the defense took the opportunity to rebut them. Thus, these alleged errors were not "egregious[]" and, crucially, as discussed in the next part, the State's case against Fravel was strong. *See id.* at 278–79. Thus, these alleged errors, even when considered cumulatively, did not deny Fravel the right to a fair trial.

## VII.

Fravel's final claim is that the evidence is insufficient to support three of the jury's four guilty verdicts: first-degree domestic abuse murder, Minn. Stat. § 609.185(a)(6), first-degree premeditated murder, Minn. Stat. § 609.185(a)(1), and second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1). Fravel argues that the evidence of the requisite intent for each of these charges—which have different requirements—was insufficient to sustain the verdicts. The jury also found Fravel guilty of second-degree felony murder under Minn. Stat. § 609.19, subd. 2(1). Fravel is not challenging the

sufficiency of the evidence as to that charge, which is for "caus[ing] the death of a human being, *without intent* to effect the death of any person, while committing or attempting to commit a felony offense." *Id.* (emphasis added). Rather, he concedes that "[o]n this record, there is no reasonable inference that Fravel was *not* involved in the fatal episode." (Emphasis added.) His argument is that there is instead a reasonable inference this was a "fatal episode of erotic asphyxia."

The intent element for first-degree domestic abuse murder is "an extreme indifference to human life," meaning "recklessness or at a minimum, gross negligence." Minn. Stat. § 609.185(a)(6); *Lussier v. State*, 821 N.W.2d 581, 590 (Minn. 2012) (citation omitted) (internal quotation marks omitted).

The intent element for first-degree premeditated murder is "with premeditation and with intent to effect the death of the person or of another." Minn. Stat. § 609.185(a)(1). " '[P]remeditation' means to consider, plan or prepare for, or determine to commit, the act … prior to its commission." Minn. Stat. § 609.18. Premeditation requires "some appreciable passage of time between a defendant's formation of the intent to kill and the act of killing, and that during this time defendant deliberated about the act." *State v. Cox*, 884 N.W.2d 400, 412 (Minn. 2016) (emphasis omitted). We have identified several categories of evidence that may support an inference of premeditation, "including planning activity, motive, the nature of the killing, and a defendant's actions following the killing." *Id.* " 'With intent to' … means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn. Stat. § 609.02, subd. 9(4).

The intent element for second-degree intentional murder is "with intent to effect the death of that person or another, but without premeditation." Minn. Stat. § 609.19, subd. 1(1). The "[w]ith intent to" definition is the same as under first-degree premeditated murder. Minn. Stat. § 609.02, subd. 9(4).

When reviewing the sufficiency of the evidence, we first determine whether the State presented direct or circumstantial evidence at trial. *State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024). If the State relies solely "on circumstantial evidence to prove the element of intent, we use a two-step test to determine whether the State presented sufficient evidence of intent." *State v. Griffin*, 887 N.W.2d 257, 264 (Minn. 2016). First, we identify the circumstances proved. *State v. Firkus*, 31 N.W.3d 468, 478 (Minn. 2026). To do so, we "winnow down the evidence presented at trial by resolving all questions of fact in favor of the jury's verdict." *Id.* (citation omitted) (internal quotation marks omitted). Second, "we consider whether the reasonable inferences that can be drawn from the circumstances proved, when viewed as a whole and not as discrete, isolated facts, are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Id.* (citation omitted) (internal quotation marks omitted). In doing so, "[w]e give no deference to the jury's choice between reasonable inferences." *Segura*, 2 N.W.3d at 155.

We conclude that the circumstances proved relevant to Fravel's intent that are consistent with the jury's verdicts are as follows. Fravel verbally and physically abused Kingsbury throughout their tumultuous seven-year relationship. During college, Fravel called Kingsbury derogatory names and told her that she "had trapped him in the

37

relationship by getting pregnant." Several times throughout 2018 and 2023, Kingsbury's friends noticed bruising on Kingsbury's neck that Kingsbury, at times, attributed to Fravel. Two friends observed Fravel yell profanities at Kingsbury and backhand or shove her.

Kingsbury reconnected with S.S., an old college acquaintance and Fravel's former fraternity brother, on a dating application in 2021. In December 2022, Kingsbury and S.S. became intimate and saw each other every few weeks until Kingsbury's disappearance.

On December 7, 8, and 9, 2022, Kingsbury and Fravel texted about separating. Kingsbury wanted to separate because of how Fravel treated her. Fravel pushed back on Kingsbury's reasons for breaking up, told her not to "twist things," and sent her photos taken throughout their relationship for over an hour, even after she asked him to stop.

In mid-March 2023, Kingsbury again decided to separate from Fravel. She expressed concern to her friend about leaving Fravel because "he told her that she would not be leaving with his kids." On March 25, 2023, Kingsbury searched "coming clean about cheating" on the internet. On March 27, 2023, Fravel pressured Kingsbury to look for a new residence in Rushford close to his parents' house where he would be living.

In the days leading up to March 31, 2023, Kingsbury told family members that Fravel "was kind of following her around the house, looming around her, making her feel kind of uncomfortable," and asking if she was texting S.S. On March 30, 2023, Kingsbury told her friend that Fravel was "hovering over" Kingsbury as she worked from home and "was asking why she was leaving him," "are you really leaving me for another man," and "[a]re you really going to let another man raise my kids." Shortly after,

38

Kingsbury went to that friend's residence and then to S.S.'s. The same day, Fravel asked Kingsbury why she stopped sharing her location with him and said she was being "very hostile today."

On March 31, 2023, Kingsbury and Fravel dropped their children off at daycare together and returned home at 8:14 a.m. The last time Kingsbury's cell phone activity tracker application recorded activity was 8:13 a.m. There were no outgoing texts, phone calls, or any other activity from Kingsbury's cell phone after 8:15 a.m. Fravel knew Kingsbury's schedule and that she would leave for work after daycare drop-off that day.

After returning from drop-off, Fravel switched the license plates on the van and sedan. Fravel left the house in the van at 11:26 a.m., drove south, concealed Kingsbury's body,[11] and returned home at 1:28 p.m. He had enough time to drive past the southernmost Highway 43 camera to where Kingsbury's body was found, unload her body, place it in the ditch and partially inside the culvert, and drive back. Fravel left his cell phone at home. He did not tell investigators that he had concealed Kingsbury's body and instead lied about driving the wrong items to his parents' house.

Law enforcement observed no indication of forced entry or physical struggle at the house on the evening of March 31, 2023. The next day, investigators observed Kingsbury's personal effects, including the coat that she wore the day she disappeared, her backpack, cell phone, laptops, and wallet in the living room near the front door.

---

[11] Fravel concedes that "[t]he evidence was … sufficient to prove second-degree unintentional murder," and nowhere in his challenge to the other murder counts does he contest that he concealed Kingsbury's body.

Investigators also found grey bedding that matched the grey fitted bedsheet used to wrap Kingsbury's body and black tape matching the tape used to secure the sheets. A photo of the house's bathroom from March 2023 depicted a towel that was consistent in color and pattern with the towel found around Kingsbury's head.

Investigators observed marks on the walls in two bedrooms where cameras had been attached and empty Wyze brand camera boxes in the garage. At least two Wyze cameras were operating at the house in 2023, capturing images including of a bedroom and the backyard. On March 29, 2023, a "delete device" action on Fravel's cell phone severed the connection between the base station and the outdoor camera such that it "would not gather any more data." Investigators could not tell whether the "delete device" action also severed the connection with the other cameras.

On June 7, 2023, officers discovered Kingsbury's remains in a ditch next to a rural gravel road, partially inside an unmarked culvert, and underneath logs and sticks. Her body was found fully clothed and wrapped in a grey fitted sheet secured with black duct tape. There was a towel tightly wrapped around Kingsbury's head, covering her chin, mouth, nose and eyes, and tied in a slip knot. If the towel was placed there before Kingsbury died, "[i]t could have obstructed her breathing." Kingsbury's death was caused by homicidal violence, most likely by asphyxia.

After identifying the circumstances proved, we identify "the reasonable inferences that can be drawn from the circumstances proved when viewed as a whole and not as discrete and isolated facts." *Segura*, 2 N.W.3d at 155; *see also State v. Silvernail*, 831 N.W.2d 594, 599 (Minn. 2013). We will not overturn a guilty verdict based on mere

40

conjecture or speculation. *State v. Hayes*, 831 N.W.2d 546, 553 (Minn. 2013); *State v. Colgrove*, 996 N.W.2d 145, 150 (Minn. 2023). "[P]ossibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *State v. Taylor*, 650 N.W.2d 190, 206 (Minn. 2002) (citation omitted) (internal quotation marks omitted).

Fravel argues that a reasonable inference from the circumstances proved is that, on March 31, 2023, Fravel and Kingsbury were engaged in consensual erotic asphyxiation as sexual foreplay. He now advances a new theory on appeal that he tied the towel around Kingsbury's face rather than choking her around her neck because it was less dangerous and less likely to bruise, that the slip knot was intended as a precaution to allow Kingsbury or Fravel to release the towel, that pulling on the wrong side of the slip knot would accidentally tighten the towel instead of loosen, and that Fravel either misjudged the timing or pulled the wrong way on the towel and tightened it such that he could not untie it, resulting in Kingsbury's death. Fravel argues that this inference shows Fravel's ordinary negligence and not gross negligence (as required for first-degree domestic abuse murder), intent to effect Kingsbury's death (as required for first-degree premeditated murder and second-degree intentional murder), or premeditation (as required for first-degree premeditated murder). Consequently, Fravel asserts, the verdicts for those three counts must be vacated, leaving only the second-degree felony murder count.

Looking at the circumstances proved as a whole, an inference that Kingsbury's death was an unintended consequence of consensual erotic asphyxiation is unreasonable. Fravel's theory uses a handful of the circumstances proved as a jumping-off point for

41

mere speculation. *See Colgrove*, 996 N.W.2d at 150. His hypotheses that Kingsbury and Fravel were engaged in sexual activity on the day of the murder, that a towel was used as a safer way for them to engage in consensual asphyxiation, and that a slip knot was used as a precaution are not based on or supported by the circumstances proved. Furthermore, this inference does not follow logically from the circumstances proved, including Kingsbury's recent decision to break up with Fravel, Fravel learning about Kingsbury's connection with S.S., Fravel's looming and uncomfortable presence around Kingsbury in the week of March 31, 2023, his decision to disconnect the home security cameras and switch the van's license plates, or, perhaps most glaringly, Fravel's decision to conceal Kingsbury's fully-clothed body in a rural ditch and culvert.

The State's inference that Fravel planned, intended, and caused Kingsbury's death is the only "reasonable inference[] that can be drawn from the circumstances proved as a whole." *Griffin*, 887 N.W.2d at 264. Fravel could no longer control Kingsbury through emotional manipulation, verbal threats, and physical abuse and decided out of jealousy and anger to take Kingsbury's life. Before the murder, Fravel disconnected the security cameras at their house to ensure they would not capture the murder. He knew Kingsbury's schedule and planned to kill her after they returned home from dropping their children off at daycare and before Kingsbury left for work. In that time, Fravel had ample opportunity and means to kill Kingsbury by asphyxiation. During the time it took for Kingsbury to fall unconscious and die from the asphyxiation, Fravel could have prevented Kingsbury's death but chose not to. Instead, he wrapped her body in a sheet and duct tape. He then covered up his actions and whereabouts on March 31, 2023, by

switching the van's license plates, leaving his cell phone at home while transporting Kingsbury's body, bringing her body to a remote rural location, placing her body partially inside a culvert running under a gravel road, covering the exposed portion of her body with large branches and brush, and providing law enforcement with a false alibi.

Accordingly, we hold that the evidence was sufficient to prove Fravel's premeditation, intent to cause Kingsbury's death, and extreme indifference to human life.

\*     \*     \*

Because we hold that admitting Kingsbury's hearsay statements under Rule 807 was harmless, that the court did not abuse its discretion by admitting expert testimony on commonalities in domestic violence relationships, that the court did not plainly err by admitting the medical examiner's opinion that the cause of Kingsbury's death was homicidal violence, that eliciting expert testimony regarding sexual abuse did not affect Fravel's substantial rights, that any misconduct that the prosecutor committed by misstating the standard of proof did not affect Fravel's substantial rights, and that the alleged errors cumulatively did not deprive Fravel the right to a fair trial, we conclude that Fravel is not entitled to a new trial. We further hold that there was sufficient evidence to prove Fravel's premeditation, intent to cause Kingsbury's death, and extreme indifference to human life. We therefore affirm.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of convictions.

Affirmed.